V. Beltran-Leyva, Guzman Loera, Mr. Furnish May I proceed?  May it please the court, a criminal defendant is entitled to a fair trial, not a perfect one, the truism holds. And I won't ignore the elephant. With a defendant as infamous as Chapo Guzman, even a platonically impartial appellate judge might find himself tempted to look past any flaws in the proceedings below, thinking the accused and prosecution one of a kind. That putative impulse, however natural, deserves resistance. Why? Though it may not be obvious, the court's decision here will have ramifications far outliving Chapo Guzman's case. After all, American legal annals, and particularly the annals of this court, are full of popular boogeymen du jour. Gotti, Capone, Noriega, Abdel-Rahman, said to pose novel threats infinitely graver than anything before or since. So if corners are cut to incapacitate a perceived public enemy like my client, some government lawyer 50 or 100 years from now will hold up this case as precedent to take similar shortcuts for the next El Chapo. The perverse result? Incremental rights erosion and a distinct, if limited, class of defendants beyond application of conventional legal rules in precisely the cases where their protections matter most. As Judge Parker of this court memorably put it, not Judge Park, Judge Parker, the administration of justice must be at its best when the stakes are highest. With public trust in official institutions plummeting, society can ill afford the impression of a two-tiered justice system. If there's no procedural justice for the reputed worst among us, there can be none for any of us, not least those falsely charged. And in Guzman's case, that unfortunate impression arises from two principal errors calling for remand or reversal. For one, sweeping under the rug an in-depth Herstand account reduced to unchallenged published report of breathtaking jury misconduct permeating Guzman's three-month trial from start to finish. For another, imposing an unparalleled set of stifling defense restrictions, including indefinite pre-conviction solitary confinement in a modern dungeon the government itself has since shuttered as hopelessly primitive. Wait, wait, wait. They shuttered the whole MCC. Correct. Yeah, so that like applies to everybody who is held in the MCC. The dungeon you're talking about is the solitary confinement, not the MCC in general. Imagine solitary confinement, the worst of the worst. And the solitary confinement, excuse me, the solitary confinement did not prevent him from meeting with counsel for as much as 20 hours a week? It did not, but we have already cited in the brief that meetings with counsel to effectuate the bare minimum, attempt to effectuate the bare minimum. Well, I'm just saying, if you're talking about, you know, the oubliette and putting people away where they are psychologically damaged because they can't talk to anybody, he's not exactly in that kind of solitary confinement. He's not in isolation from the world. Sure he is. He can't talk to any fellow inmate. He can't talk to a guard. He can't talk to anybody. He can talk to his lawyers and talk like this. But I mean, the important thing is he's he's seeing people on a regular continuing basis. He's seeing his lawyers. But that's not the kind of isolation that international authorities condemn because it takes a grievous toll to be in a place where you have no human contact. It's worse because he's not. I understand that. But that's really I mean, seriously, this is worse because he's not convicted of anything. Once he's convicted of something, he doesn't have to see any lawyers. This is an innocent man. At least we indulge that fiction. I'm sorry, I don't understand what you're talking about. The question is, you're saying this is an unprecedented being in a black box when it is in terms of psychological damage. Of course it's unprecedented for an innocent man. I mean, the cases are cited in the brief over and over again of demons, demons that we handled. And to the extent that that's true. Why is that? What do we have to do with that? Meaning this is an appeal of a criminal conviction. It's not an appeal which could have been taken at the time from orders sustaining these various restrictions. Right. No, we couldn't have taken that. Why not? Why aren't these entirely collateral orders to the extent that it's to the merits of the case? What excuse me? Why does it relate to the merits of the case to say that the defendant is put in the special housing unit? How can we appeal the sham? How can we do that? You do it by filing an appeal. There's no precedent for doing that. It's never been done. Never in this court. I've never seen any authority. Why is that not a collateral order? If the argument is that this is cruel and inhumane. No, not within the meaning of the Eighth Amendment. The Eighth Amendment doesn't apply now. The Due Process Clause. There are plenty of lawsuits of that Bell against Wolfish. Civil lawsuits? Yes. We're not bringing civil lawsuits. Yeah, you didn't bring a civil lawsuit. Excuse me. There was no civil lawsuit. It would be obscene. It would be obscene. Excuse me, please. There was no civil lawsuit. There was no appeal of any of these orders on grounds of substantive due process that these conditions are inhumane. Does it not follow that what you would have to show, even if he was totally mistreated. I mean, you can still file a lawsuit, a statute of limitations permitting for damages on that ground. But don't you have to show here that this prejudiced his defense. Isn't that what this case has to be about? Well, it does affect it. I understand you. I'm saying, are you agreeing? No. No, you're not. You're saying we can reverse the conviction, even if he's been proven beyond a reasonable doubt to be guilty, even if there were no. I understand that you have many arguments about various trial errors, including a very serious one about the jury. But apart from that, if none of that existed, we could reverse the conviction simply because he was badly treated in the pretrial. Let's assume the worst in the pretrial process without any effect on the prejudice to the trial. Well, there is an effect because I understand you keep saying that time. But is that what you have to show or is that not? No, it's not. That's what you're saying. If I had brought a civil suit, there would be younger abstention. The court and the government would jump in right in and argue. You can't interfere civilly with a pending criminal prosecution. Excuse me. Please let me ask the question. Sure. Why is there a bar? Why would it be a younger bar if the challenge is not about the ongoing prosecution? It's about the conditions of confinement. Because in order to justify the conditions of confinement, unchallengeable ex parte submissions were made to the district judge after having been made. And they would be made to this court, too, presumably. And we would decide whether that's wrong. And you get to see it. Because the district judge has made a ruling upholding and was invited. And there were several motions to modify the stands and modify the conditions. And each time you would go back before the district judge. The district judge would rule on it. And that's the remedy. And why do you get why is your remedy for it? Reversal of conviction, even absent prejudice. I understand. Don't tell me you're saying that's a prejudice. Make your argument about prejudice. But you're also making an argument that you do not need to show prejudice. The conviction should be reversed and he should get a new trial. You're not saying because he was tortured, in effect, by being in the NCC under these conditions, that the charge should be dismissed, right? You're not making that argument. No, it's not a government misconduct argument. So it's an argument that he should get a new trial. Why? To punish the government because they did bad things to him? Because the combination of unprecedented restrictions made it impossible to meaningfully prepare a defense. So it's all about the prejudice, yes? Albeit with a far less showing of prejudice required because we can't point to specific prejudice for a vast majority of reasons. One of which is that we never saw the documents and a great deal of the proceedings were conducted ex parte. So to be clear, my structural error argument is confined to the jury misconduct point, and I'll try to get back into that eventually. But I'm not saying, to the extent I misunderstood Your Honor's question earlier, that we should penalize the government without any showing of prejudice. So your argument is going to be that he did not get a fair trial because these conditions that were imposed prevented him from presenting a defense. And compromised his ability to meaningfully personally participate in a defense to avail himself. So tell us about that and how it prejudiced him. The right to count, if you cannot meaningfully participate in your defense, and the cases are legion, including on the panel that Your Honor set up. So again, tell me how he was prevented from participating in the defense during the time period when he is sitting in a jail cell, not able to communicate with the outside world, but able to sit with the lawyers and go through the discovery documents that are available on computers in one-to-one meetings. Well, because the case law says, and it's from the Supreme Court on down, that there's never been a study showing the absence of significant cognitive impairment after 10 days of solitary confinement. So first of all, you're impairing his cognitive, emotional, and mental faculties. And those studies, all the stuff about solitary confinement, includes people who actually are in personal, physical contact with other human beings who are assigned to defend him or retained to defend him during the entire period of his confinement. What Your Honor is doing, respectfully, is making one constitutional right contingent upon the existence of another. The only reason that he's permitted to see lawyers at all is because he's presumed innocent, and he has a Sixth Amendment right to do that. That does not ameliorate the cognitive decline, the cruel and inhumane conditions, and the inability to fully participate in his defense and fully avail himself and implement his right to defend himself. But is there anything in this record where his lawyers said to the judge, judge, we've talked to him, but we're having difficulty understanding him because of his impairment? Absolutely. There is? There were various motions made and various attempts on the part of the district court to ameliorate the conditions. No, I didn't ask you whether there were efforts to ameliorate. I asked you is there any indication in the record where the lawyers said, judge, we can't adequately consult with our client because, and here are the specifics, on Wednesday he was gibbering, on Thursday he was mumbling, and on Friday he was in silence for at least 20 minutes at a time. Things like that. Anything like that? There were more generalized allegations. There were just generalized allegations that we're having trouble properly representing him. No, that his mental and physical state are deteriorating. Were there any specifics? General allegations that his mental and physical state were deteriorating. Specific allegations about how discovery couldn't be reviewed properly because of the restrictions that had been imposed. And then magistrate Judge Mann was tasked to investigate that allegation. And she found that Guzman did not pose the kind of threat that he did in Mexico, that it was unreasonable to presume that because he had escaped then, he posed the same threat now. That's a very different issue. I mean, I wish you'd stay with one point at a time. You'll have time to cover the others. Not saying give him up, but to tell me he's an escape threat has very little, if anything, to do with whether his confinement prevented him from communicating with his lawyers. What I'm asking, yes, as I indicated, the conditions of confinement, albeit not related to his declining mental condition, were preventing him from communicating effectively with his lawyers and reviewing discovery, and there was an attempt to mitigate those conditions. And what are the specifics that show that? I know you're claiming it, but what are the specifics that show it? I don't want to mislead, Your Honor, or not communicate it clearly. The difficulties in communication that I'm referring to right now were not related to his mental state or his declining mental state. They were related to logistics concerning the conditions of confinement and the inability for them to contemporaneously review electronic discovery. Yes, but that was changed. It was changed. And that was changed the day before the trial? No. No, that was changed substantially before the trial, right? Correct. So the lawyers then had the full opportunity to review documents with him in the prison. It's the caliber of the review. Unless we're going to discount these studies. No, no, no. If you're going to talk about studies, now you're going back to the mental deterioration. Correct. I thought you had shifted ground now to be talking about the logistics. They're two separate things. The conditions in terms of, in answer to Judge Newman's question, the conditions to which I'm specifically referring now, the inability of them to physically do it together, was ameliorated by the inclusion of a computer screen. I'm now talking about, I'm now going to your question, the qualitative caliber of the review having nothing to do with the mechanics of it electronically. Having to do with his mental deterioration. Correct. But that's what Judge Newman was asking you about. Yes. And then you said that was, it was told to the district court that his mental condition is deteriorating. In a generalized sense. Was there any evidence of exactly how that was interfering? No. Okay. No. I don't want to mislead Judge Newman about it. There were generalized complaints that we see him, his ability to understand and meaningfully participate is going down. We're representing that as officers of the court. We've seen it. In fact, I've seen it. Could I ask you to turn to issue number eight about juror misconduct? Yes. Specifically, what your support is for, I guess, the argument that an intentional lie during a trial by an impenitent juror is structural error. My support for that is the plethora of Supreme Court structural error cases that Judge Park is well familiar with, obviously, that are completely analogous to this. What are the hallmarks of structural error? One, structural error implicates institutional interests transcending the particular merits of the case at hand. Two, a structural error has implications and effects that are incalculable, immeasurable, impossible to quantify. And three, a structural error almost inevitably signals fundamental unfairness. So the Supreme Court says, well, the cost of conducting an individualized prejudice analysis aren't worth it, so we reverse automatically. And what are some examples of that? Well, the biased fact finder, the incompetent fact finder, a defective reasonable doubt instruction, all good ones that vitiate the entire fact-finding process, that go straight to the heart of its integrity and fairness, and that are just too global and too overreaching, overarching, I should say, and too hard to quantify. And that's what happens when you have at least, by the district court's count, five jurors who don't know the meaning of it all. Did it make any difference that they said that, or that the vice article reports that they, the juror said that it was out of fear of being held in contempt that they gave the answers that they did, and there didn't seem to be any indication that it reflected some kind of prejudice? I think that makes it entirely worse, because the district court told them, told them specifically, you are not in trouble, you haven't done anything wrong, and there's not going to be any ramifications for it, and they still lied. So if that doesn't cry out for at least an inquiry, I don't know what does. It just doesn't wash. And the inquiry that you have in mind would be, I can think of two things that could be done. One is bring in the reporter and put him in prison and civil contempt if he refuses to divulge his source and there's a ruling on a complex issue of whether there's a privilege. The other would be to bring in all 16 jurors and question each of them again about what they may have done or heard. And immunize them, just like happened in the McCoy case that was before the court, out of the next case in Buffalo that was out of the court, out of this court a few months ago. You grant them immunity, and you inquire. I mean, it happened in Roger Stone's case. It happened in the Ionella case that Judge Lynch and Judge Newman will certainly remember. It's not unprecedented. It's happened in high-profile, complicated cases. It's going to take work. I'm not going to sit here. Well, it's not a question of the work isn't the problem. The problem is that this is exactly the kind of fishing expedition where all of the jurors get interrogated. How about starting with the one juror? Excuse me? How about starting with the one juror? Who is the one juror? Well, the court would have to find that out. Well, yes, but it would have to find it out by being the reporter in first. That was the first option. And you were sort of shaking your head about that. There's also notes. But we're going to subpoena the reporter for his notes, for his outtakes notes. The juror's notes. The juror kept notes. You can get those from the juror. That would identify him. Wait, wait, wait. I'm sorry. From which juror are we getting the juror's notes? The juror says in the article that he kept notes. Yes. Who's that? The court has to grant, appoint counsel, just like happened in the Nix case. No, no, no, no. I'm sorry. I'm just trying to understand what's going to happen. Is it not the case that you have to interrogate every juror? Because we don't know who the source of the article is. In order to ascertain the source, that doesn't necessarily call for an in-person, full-blown interrogation with everybody present. There are myriad ways that this court can find out who it was, perhaps by affidavit, just to find out who the person was. Who's affidavit? Each of the jurors. Each of the jurors are required to testify under oath in response to a set of questions, whether they come to court or whether they file an affidavit or a form under oath responding. In the first instance, to determine who the person is. Absolutely. And immunize the answer. It's not that hard. That's not the question of hard. The question is the intrusion into the jury process. How much of an intrusion? Well, I understand there is going to be some intrusion, but that's inherent any time there's a post-trial inquiry of any sort. There is going to be some intrusion. And this is all based on the hearsay from the reporter. It's not hearsay. There are declarations against interest, first-hand allegations made by the juror, him or herself. You just said it's not against interest because they were assured that they were not under any threat. No, he says he perceived that it was against interest. So then if it's not against interest, he won't invoke the Fifth. He thinks it's against his interest. He thinks he was going to get arrested or held in contempt. He thought they all were. So who does that? Who makes a self-inculpatory statement? I mean, Mrs. Williamson? This is Crawford stuff? Nobody makes that. Look, maybe it's not true. And then we move on. And then there's no cloud hanging over. That's fine. I'm not sitting here saying I'm sure. I have no idea. But I'm saying it's very disquieting in a case like this to do an end-around. Did you just let it go? I get that there's going to be some quantum of intrusion. I mean, this guy is going to be in a box for the rest of his natural life. I'm not asking you to play violins for him. And I'm not playing any violins for him either. This is very, very serious business for everybody concerned. Everybody concerned. This is his last shot. And he has the right to have this answered. And maybe there's nothing at all there. And this person was a whack job, and he wanted publicity, or he's grandiose. I have no idea. None of us have any idea. But nobody, I mean, he wasn't that much of a whack job that he was willing to put it out there who he was. No, he wanted it sort of both ways. Or she or they. I don't know what they are. But, I mean, it's troubling. Who can leave this cloud of uncertainty in a case of this magnitude? That's not what we do here. I mean, look at all the roster of names who've had hearings before. A hearing. That's all. And look, I don't know. It's a big, giant circle. This is not this argument about the structural error. This is not some throwaway argument. If it turns out that five or six jurors got together and lied to the judge, right to the judge's face in the middle of a trial about something this important, that's not something we can just slough off. That is a structural error. What could be worse than a fact finder, and I'm just taking it from the cases, who has no respect for the integrity of the oath, who just lied to the judge's face. Nobody can get away with that. And there's six or seven or eight of them, according to this article. So if we're going to presume the truth of the article, if we're really going to do that, then you've got to throw out the conviction. You have to. If we're not going to truly presume the truth and conduct some kind of inquiry, you can't have it both ways. It's one or the other. If you're going to truly give full play to all of this, how can we countenance what's ostensibly presumed to be true, which is that six people, and they didn't just, according to this account, read one or two things or cherry pick here and there. It says we're doing this throughout the beginning of the trial. And they say nobody lied in voir dire. That's not an essential claim. Maybe they believed genuinely at the time of voir dire that they could follow the instructions and they wouldn't pay attention to the press. And somehow it changed, and they decided to read everything. I sat here and listened to the Twitter argument before, and Judge Lynch asked a pointed question. I don't know what this is about. Well, maybe it's about Armageddon being nigh. Can you imagine the amount of volume of stuff that came out about this trial on Twitter? In real time, I've got a footnote in there like this as to what came out. And it's not just persiflage. It's analysis, observation, saying the guy's guilty of sin. It's talking about stuff that never came into the trial. And I know with Donius, there's unique challenges with social media. If we're going to presume this happened, give the article full play. Otherwise, conduct some kind of inquiry. Didn't the district judge do that by saying that the court would assume the truth of the article? He said once with respect. Listen, it's a hard issue. Did the court do that? No. He said he did it, and he didn't do it. Let's be clear what we're talking about. Did the district court say that the court would assume for purposes of the motion the truth of the article? He said he did, and then he blackwashed it. So if he said he did, and we're not going behind that, are we? Yes. Oh, now you're saying the judge is lying? I'm not saying he's lying. I'm saying that he's taking what he said as so. I'm saying that he identified the truth of the article. I'm saying that he purported to do that. What do you mean? Well, when you throw in purport, that's a loaded word, and you know it when you use it. I'm using it advisedly. He did not do it. He said he was going to do it and did not. So you're saying he lied. I'm not saying he lied. I'm saying. Now, wait a minute. Let's be clear with our words here. The judge said he assumed the truth of the article. And his analysis did not do so. Let's go to part analysis for a minute. We'll come to that. Yes. Did he assume the truth of the article? I can't change my answer. He professed to do so in theory and in practice did the opposite of that in certain instances. Well, either we accept that he assumed the truth of the article. I don't. Or we doubt that he did. I doubt it. And you're inviting us to doubt it. Correct. So then you're inviting us to say he lied. No. I'm inviting your Honor to read exactly what I wrote in the briefs. I don't say that he lied. He's trying to do the best job he can. I'm saying he got it wrong. He said one thing and did the other. Mr. French, maybe I can help here. As I read the district court's opinion, you can tell me if I'm wrong, he did two things. The first thing he did was say, I don't need to have a hearing. There's not enough of a showing here because this is hearsay. It's just a reporter talking about someone who's anonymous who hasn't come forward. Then he said, in the alternative, I will assume that everything that's in the article is true. And if so, I don't think it's enough to grant a new trial, taking what's in the article as true. Those are the two things the district court did, right? No. So he didn't really say number one. Number one, the government said, and he didn't accept that. He said that there are specific, concrete allegations of impropriety, and those are enough for me to address. The rest of the stuff, not that it's hearsay or inadmissible, it's too vague. The rest of it is too general. Okay. So on your view, all that he said, although the government would want to make the argument that he didn't need to say that because of the hearsay, whatever. Yes. He assumed that everything in the article is true. So why do we have to worry about the judge's mental processes? Isn't your argument that if you take, and I think you just said this a few minutes ago, if you take the article as true, then there must be a new trial? That's your argument. That's one of your arguments. If you're truly going to take that. that the judge assumes the truth of this, then it seems to me he's either right or wrong that assuming the article is true, there does not need to be a new trial. That's what the judge ruled, and you are challenging that because you are saying that if we, following the district judge, take the article as true, he should be reversed. Take the article, the parts that are admissible as true, yes. And he blamed me for picking and choosing. I didn't pick and choose anything. That's what Rule 606 does. I faithfully adhere to Rule 606. So when the jury says, well, we don't get hung up on that, it didn't affect our deliberations, that is not something that can be taken. You can take it as true, but you can't consider it. Because that's not a statement against interest. That's self-exculpatory. No, because it's prohibited by Rule 606. Because also it's about what the deliberations were as opposed to what the misconduct was. Well, it gets into their state of mind, deliberation or no deliberation. Yes, you can sometimes say yes, it'll help you. In other words, you can't take it into account for two reasons at least. One is it's not non-hearsay because it's not against interest, the self-exculpatory part. And two, because unlike an admission, if that's what it was, of misconduct, which is about stuff extrinsic to how they fought, just about what they did, this is about the actual deliberations. When he says, oh, we didn't really pay much attention to that, he, she, it, or they, that part is all about the deliberations and therefore cannot be taken into account. But what you are saying the district court took as true, and we must take as true if we are going to affirm the district court on the ground that the district court gave, is that the allegations of misconduct taken as true, the misconduct, since we're taking it as true, the misconduct is not sufficient to warrant a new trial. You're saying that's what the ruling has to be in order to affirm the district court on his own ground, and you're saying that's wrong. It's what precedent holds in Colombo, in our circuit, that in the absence of a hearing, the allegations have to be presumed true. So it's not, if we had gotten a hearing, there would be no need for any of this debate about presuming anything. It's because we didn't get a hearing that the allegations have to be presumed true. But you're really, you're really taking it almost, and maybe we're quibbling here, but it seems to me your argument should be, is that if you take it as true, it does require a new trial. And therefore, our options are either to grant a new trial, because we assume that it's true, or to hold that we don't care about what happens there, as reported in the article, or to say, well, it would get you a new trial if it's true, and therefore you need a hearing. That's the argument. Okay. So, you know, and you made the argument that what is in the article consists of, if we take it as true, that the jurors A, consistently, some portion of the jurors, maybe as many, between five and seven, consistently followed news reports, specifically were aware of a couple of highly prejudicial, at least in the ordinary case, highly prejudicial allegations that were kept out of the trial, and three, deliberately lied to the judge about what they had done. Yes. Okay. Sounds like not a bad argument. I'll be interested to hear what the government has to say about it. That's the argument. Thank you, counsel. You're reserved three minutes for rebuttal. We'll hear from the government. Mr. Mehta. May it please the court. Harold Mehta for the United States of America. I'll be listening to Guzman's argument on point eight, the issue of the anonymous juror. My colleague, Mr. Reynolds, will address the issue of the conditions of confinement. Let's begin with the anonymous juror. The district court did not abuse discretion in denying Guzman's motion for an evidentiary hearing in a new trial under Rule 33. There are essentially three concerns raised by the Vice News article. One, extra record information. Two, potential false statements made during VADIR or mid-trial. And three, premature deliberations. I'll take one at each turn. Starting with the issue of extra record information. I want to focus the court's attention on the standard in VADIR recently applied. That focuses also on the case of Yanil and Mr. Guzman's error. And the standard is, in order for a court to hold an evidentiary hearing, not a new trial, an evidentiary hearing on an issue of juror misconduct, there must be, quote, clear, strong, substantial, and incontrovertible evidence that a specific, non-speculative impropriety has occurred, which could have prejudiced the trial of a defendant. Again, this is the standard for holding a hearing. There are two parts. One, is there competent evidence? And second, did that competent evidence rise to the level of prejudice or could have risen to the level of prejudice? The district court below focused primarily on the prejudice issue. But our briefing looks at them both. And I want to address both with importance. Number one, the evidence here is not competent. It's just not. It's anonymously sourced. It's uncorroborated. It's hearsay and double hearsay. And with allegations that are easily controverted by the trial record before you. I'll give you an example. One of the most salacious allegations in the article is that jurors learned that the district court was going to conduct a dadgery inquiry on the issue of sexual abuse allegations of Mr. Kuzma. They then decided to collude and all decided to deny seeing anything, all 18 jurors, according to the article. That is not true. It is false. It's in the record. Judge Kogan engaged in a dadgery inquiry and three jurors came forward. Two of them had seen something about these allegations. One of them had seen a news article, headline, CHAPO and vitamins. Vitamins was a term allegedly used by Mr. Kuzma to refer to underage girls. Another juror had seen something on a Reddit page, an online forum, something about CHAPO hats that had closed the window. So, in fact, this juror's allegation, this anonymous juror, is false. The trial record shows that. And compare this to what we have at EMLO. In EMLO, you have three sworn juror affidavits. Sworn on penalty of perjury, submitted to trial court. Discussing, corroborating judicial misconduct by the judge. Ex parte communications, pressuring the jury during deliberations. Gross misconduct. And there, the judge decides, this is speculative, no hearing needed. So the falsehood that you're saying the record demonstrates is that the article says that the jurors all agreed they would deny seeing anything. But some jurors said they saw something. Yes, Your Honor. That's in the record. Of course, the jurors who said they saw something said they saw something entirely innocuous. Or at least they reacted in a way, by not pursuing it further, that made it totally innocuous. Right? Well, yes, Your Honor. But the point, Your Honor, is that the article says they all denied seeing anything. There's a flat, unequivocal denial. Uh-huh. But the actual trial record... We should not take that as an allegation that they agreed that they would all claim not to have engaged in any misconduct. No, Your Honor. I think we should take the allegation in the article as word, that we denied seeing anything. I point this out simply to show the lack of confident evidence here. Because that's an important part of this court's inquiry. Think about the importance of a finality for jury verdicts. Think about the amount of time and effort it goes through. To get to the point of deliberation and have a conviction. So you primarily want us to rule, it sounds to me, that notwithstanding this article, all you have is a person, a person who is a professional journalist, for whatever that's worth one way or the other, saying that a juror told me certain things. And I take it that this argument, at least, is that it would not matter what the reporter said the juror told him or her. That will never be sufficient to warrant an inquiry into whether it really happened. Your Honor, the issues here, I think there are two points to stand on. I understand there are two points, but I'm trying to understand each argument. Just as Mr. Furnish was held to, let's stick with one argument at a time. Is it your, you have two arguments, it sounds to me, that you want to make. You haven't gotten to the second one. The first one is, this is just not good enough evidence, regardless of what it says. The second is, even if we assume that it's true, it's not bad enough conduct to require a new trial. Yes, Your Honor. Okay. So the first one, you're saying, is the first one somehow predicated on or interacting with the second? Or are you saying that so long as it's a reporter saying a juror told me that he had taken a bribe from one party to the case, and then he was initially 11 to 1, and then he persuaded everybody else, and he fought so hard because he took a bribe. It's just a reporter reporting an anonymous allegation. It doesn't matter what the allegation is. The jury, the juror believed that someone was guilty because of their ethnicity. The juror took a bribe. The juror read horrendous allegations in the press that the court had instructed him not to read. It doesn't matter. It's just not competent evidence. Is that the government's position? Yes, Your Honor, because ultimately, it's important to have competent evidence in order for a court to have an inquiry. Otherwise, any time a juror, or an elephant juror, or anyone, frankly, decided that the verdict was not up to their standards, could make some kind of allegation anonymously to some online outlet and claim all kinds of salacious things. And then would the court's ruling be that because of some anonymous source, here's the allegation by some disgruntled perhaps juror, we don't even know, would require us to haul in all 18 jurors, have them sworn, get them counsel, immunize them. Look at the court's opinion in King v. U.S. It's an older case, but it's a pretty salacious allegation. There, the defendant had thrown a grenade into the FBI agent's house, and there were shootouts outside the FBI agent's house, and the defendant fled to the Ramada Inn where the jurors were being sequestered. And there was a shootout in the parking lot of the Ramada Inn. And the next, there was tons of coverage about this. And they found a grenade on the defendant's body, a second grenade, which he had taken to the Ramada Inn where the jurors were being sequestered. And he was wounded, and he went to the hospital. It was a habeas appeal, Your Honor, so I want to make that clear. But in that case, on the habeas appeal, defense counsel had an affidavit from a juror, signed and notarized, although the notary didn't have a stamp. And the affidavit was clearly written by the lawyer, but it had to have check marks for what the juror indicated. It indicated the juror was aware of the media, was aware of why he was coming from the hospital. Fairly salacious allegations, Your Honor. I mean, if a jury believed somehow this guy had a grenade, he had come to the parking lot where the jurors were sequestered, that's far more of a place than we have here in this record. The court said, this court said, this is weakly authenticated. This type of evidence simply does not require a hearing. So we're done. So I think it's important for this court, as Ian Nealow's court warned, the evil consequence of hauling in jurors, it's not to say that the district courts don't have wide discretion. In Roger Stone's case, district courts have a wide abuse of, wide abiding precaution when they have a hearing. That's fair. It's up to the trial court to decide that. It's an abuse of discretion standards. And on this standard, on this record, this evidence simply is just not competent. It's like the case in Fumo, third circuit case in Fumo. Do you agree with Mr. Furnish? Mr. Furnish said that the district court did not exercise that discretion, that after talking about this issue, he didn't resolve whether he thought there should be a hearing, but instead he proceeded to say, I don't need to have a hearing because assuming it's true, there should not be a new trial. I disagree with Mr. Furnish's representation of the court as the district court. The district court stated that this court was crediting the allegations in order to see whether it was prejudiced. Again, in the second part of the inquiry. And found no prejudice. But the district court, in your view also, exercised its discretion to say, I don't need a hearing, even apart from the question of whether a new trial would be required if it is true. I'm exercising my discretion not to have a hearing because this evidence isn't good enough. The district court focused primarily on the prejudice issue, but does indicate and does make statements about how it's hearsay, it's anonymous, it's all in the opinion. But the primary focus of the court's opinion is on prejudice. And so let me talk about that. I understand that, but I'm just trying to figure out, you know, this is serious stuff. Yes, Your Honor. If the district court did not actually rely on the view that this is true, then you're saying there would be an abuse of discretion standard applied. But if the district court didn't actually exercise its discretion that way, I'm having a little trouble figuring out how we can say the district court's ruling should be assessed for abuse of discretion. Is it that half of it?   ruling and the district court's ruling. I understand. But again, the question is, are you telling me that when I go back, it was my recollection that Mr. French might be right, that I'm conflating the district court's opinion with your brief. And I want to make sure that you, who are more familiar with the record than I, are telling me that the district court actually, as I may be mistakenly recalled, made two distinct alternate rulings. Number one, I don't need to have a hearing because this isn't good enough evidence. And number two, even if it's all true, it's not enough for a new trial. So let me be very clear, Your Honor. I want to be very clear on the record here. The district court did not focus on the competent evidence issue. That's an emphasis. This court, of course, can rule on other grounds. It can affirm other grounds. The district court primarily focused on prejudice. And let me just say a second here. On the issue of whether or not an evidentiary hearing was required, the district court did assert and did make statements about how it's anonymous and fearsome. It did not rely on that. Right. So in other words, if we were to conclude that you're wrong in the second argument, which you haven't made yet, so I can't even begin to make an inference of that. So I'm just saying, assuming that we disagree with you at the end of the day, that the allegations, if true, do not require a new trial, don't we at most have to send it back to the district court and say, don't you think you should have a hearing? Tell us why you don't think you should have a hearing. No, Your Honor. We should exercise our discretion to say, I mean, that can't be an abuse of discretion standard. That would have to be us saying that, in fact, as a matter of law, we conclude that this is not confident evidence. Because if the district court did not exercise its discretion to say, I don't think balancing all things together, that this is good enough evidence to justify the inquiry, we can't review that non-finding for abuse of discretion. The district court didn't exercise discretion that way. The district court made factual references to what is undisputed, I take it, that this is a reporter's account of what he heard from a juror. And none of those people are under oath. It's not just we have to get over the double hearsay, I guess, that this is a non-under oath statement by the reporter, and then we have to get back to whatever was said to him. But whatever, those are the legal arguments about it. No one's disputing that what was there is this kind of evidence. But I'm not sure how we can review a decision for abuse of discretion if the district court didn't rely on that. If I understand your Honor, correct me, Your Honor. If the court does not find the district court's opinion, crediting the allegations and not finding prejudice, then the court wants to rely on in deciding this case. Or disagrees with the court's ruling on that and wants to focus on the issue of competent evidence. Is that an abuse of discretion standard on the competent evidence? Yes. That's the question. It is. And here's why. The district court... I do want to hear your answer, but just let me state the question or the problem more precisely, perhaps. If it's a question for the district court's discretion, that means the district court could have decided it either way, right? In other words, the district court could have said, you know, all things considered, while this is somewhat dubious, and yes, it's a great intrusion, under the circumstances, I think it's better to get to the facts. The district court could have done that, right? Yes, Your Honor. Okay. But if he didn't then say the opposite, that's the question. How can we judge by an abuse of discretion standard an exercise of discretion that did not happen? But the court did exercise discretion here. The court discussed the relevant standard under Baker and Anillo, discussed how it has to be competent evidence, and discussed how this was anonymous, it was hearsay, and even if I credit all of it, there's no prejudice. So they stood together. Right. It's one standard. If it turns out that we were to conclude that if you do take this as true, this is sufficiently whatever, prejudicial, sufficiently serious misconduct, that could influence a jury, if we think that's true, fine, then you still... I'm sorry, if we think who cares, then you still win. But if we don't think who cares, if we think the district court was incorrect to say, taking all this as true, it still doesn't matter, then that undercuts a large part of your abuse of discretion argument as you just made it. Because it's not just about the hearsay, it's about the hearsay versus how prejudicial it is. Yes, Your Honor. That's correct. It is one standard. I should be taking it again. Okay. And so I wanted to address... Yes, Your Honor. I don't understand why you're channeling it through an abuse of discretion lens or prison, whatever you want to call it. What I thought your position as you went through the cases was that an anonymous, unsworn, and uncorroborated report of juror misconduct, no matter how serious the alleged misconduct is, doesn't get a hearing. I thought that's what you began by saying and you emphasized it was unsworn, unidentified, synonymous, uncorroborated, and no matter what the allegation is, it doesn't get a hearing. Is that the government's position? Your Honor, I did note that the king came... Well, don't tell me what you know. Yes, Your Honor. Is that your position or not? Your Honor, that's not the government's position. The government's position is that it's two factors here. It's both whether there's competent evidence and whether there's questions. Well, I understand the government often has two arguments. Sometimes they have six. I'm asking about one of them, and it's hard to get an answer. It's been hard from both sides. I know it's a big case. I get all that. So let me try again. Is it your position that an anonymous, unsworn, uncorroborated statement of juror misconduct does not get a hearing, no matter what the misconduct is alleged to be? No, Your Honor. That's not your position? No. And I don't want to know why not. Because the standard is twofold, and it has to be used to look as complementary. And so I think that there could be a potential, although I can't think of a case either side where this is happening. You gave us all those horribles. A guy just goes out on television, and he says, a friend told me that some of the jurors did all these terrible things, and I thought you were inviting us to say that doesn't get you a hearing. Yes, Your Honor. I think the point that I was trying to make was that. Yes, it doesn't get you a hearing? Or are you going to come back to you and weigh it with the other argument? I mean, either the two arguments have to go together, or they don't. Yes, Your Honor. I think that the view of the standard and Baker's have to go together. And so I think that you need to look at both, whether there's competent evidence, and also whether there's a possibility of prejudice. Of course we'll look at both. Yes, Your Honor. The question is, does the defendant have to win on both to get his argument, or is winning on any one of them? Or can you win and defeat the hearing by the first argument? I don't know why this is so difficult to find out what the position is. If the court rules that the evidence here is not competent evidence, then under Baker, the government wins. There should be no hearing. Wins because, regardless of exercising discretion, wins because that type of evidence, as a matter of law, does not get a hearing. Yes, Your Honor. So that is your position. Yes, Your Honor. Well, OK, that's what I thought. Because the Baker court said yes five minutes ago. Yes, because the Baker court says that you have to show competent evidence of a specific impropriety that could have caused prejudice. So if you don't have competent evidence, you don't have one of the elements of a standard. So if you don't have competent evidence, you cannot meet the standard under Baker for an evidentiary hearing. That's the standard under Baker. To be clear on that. I want to talk about the McDonough issue, the false statements made during midtrial. That's different than the issue under the Baker standard. Under McDonough, a false statement made by a juror has to conceal the bias in order for there to be a hearing. For example, the only case that this court were sent back for a new trial, Parse, was a biased juror. Figure out the facts in Parse. In Parse, you have a juror who lies about being disbarred, about being an attorney, about having numerous arrests and convictions, who refers to defendants as crooks, who writes a letter to the prosecution, extolling the virtues of government, how wonderful the case was, and how she had held out as much as she could on the verdict for the acquittal. There, clearly, there's a misstatement, a panoply of misstatements and false statements made, concealed bias, bias in favor of the government, bias against the defendants. Here, the only misstatement issue is whether or not the jurors have seen sexual abuse allegations. And the Biosmooth article we credited states very clearly that this was done to not defend the public. That's not bias. Simply is not. It's not something that can be parsed or any other case involving a biased juror. And so on that issue, the district court denied me the discretion in finding, not having a name for an evidentiary hearing. Now, I want to get back to the prejudice issue, if I can, Your Honor. If you look at the kind of information that was sent back here, the marital affair by defense counsel, which, while salacious, is not presently defendant, was not a defendant's actions. And jurors are aware that their defense counsel is different than the defendant. And then the issue of underage girls, which, again, is a very serious allegation. But that's what it was, an allegation. And if you look at the records here, and look at Farhan, for example, or Lilithio, the kind of factors the court should consider in determining whether or not this prejudice is a hypothetical average jury. If you look at the court's instructions, they were daily and more than daily for the jury. The observations the court made of the jury. Remember, this is a jury which, on three different occasions, came forward with various issues to the court. One, that several jurors noticed that one of the alternates had been drinking. Two, that they had seen a defense paralegal at the subway. And three, that their child had come up to an ambulance and asked them about the case. And each time, jurors had come forward to the court, acknowledging the instructions by the court. The length of deliberations here, six days after the article came out. Remember, it came out the Monday morning of deliberations. In six days, the jury deliberated after that allegation. The fact that there's a mixed verdict here. While there were conditions in all 10 counts, in count one, two of the violations were not found by this jury. Showing again, that this hypothetical average jury looking at the entire record, as Farhan says we do, in determining the hypothetical average jury, the fact that President's here. And finally, of course, the weight of the evidence. Here you have a case where you have a defendant who tortured and murdered numerous individuals. There is video of him interrogating a victim tied to a pole that was shown to the jury. We have calls of him discussing violence and narcotics trafficking. We have 14 cooperating witnesses discussing the various murders and tortures he committed in his own hands and by the order of others. And you have that type of evidence here, and the strength of the evidence, the type of evidence. The district court did not abuse discretion in finding that there was not prejudice. And therefore, did not have to hold evidentiary hearing after crediting the allegations in the Bison's article. There's no personal prejudice, and I'm happy to move on to the last issue, which is the preemptive deliberations. I think the Baker case is very helpful on this point, which is that when you have an allegation of preemptive deliberations post-conviction. Rule 606B circumscribes what questions the court can inquire into. And you cannot inquire into what effect the deliberations had on the verdict. And therefore, Baker says, in that case, an evidentiary hearing is quote, unquote, futile and a net non-needed. And similarly here, the district court did not abuse discretion in denying evidentiary hearings an issue of premature deliberations. No more questions on this. Jury point out Mr. Reynolds can address the prison confinement. Good afternoon. Brett Reynolds, Department of Justice trial attorney also on behalf of the United States. Just very briefly on the solitary confinement and special administrative measures point. Mr. Guzman contends, of course, that his solitary confinement and the restrictions imposed pre-trial violated his due process and Fifth Amendment rights. But there appears to be no dispute that the district court here followed the correct standard. The district court followed this court's instructions in El Hajj to apply the Turner v. Safley test. So on that standard on which there appears to be agreement, the question is the facts the district court was presented with. And this judge was presented with a defendant who had already escaped from prison twice in Mexico in dramatic fashion, who had a history of intimidating and killing perceived rivals, and who had previously run his criminal enterprise while incarcerated. On those facts, with no real dispute about the legal standard, there's no basis to overturn the district court's conclusion. Because as this court itself explained in El Hajj, relying on the Supreme Court precedent, conditions of pre-trial detention are constitutional so long as they're administrative rather than punitive. Turner, in turn, tells the district court to be deferential to the determinations of prison and jail officials about running the prison, about what's necessary for prison security. Turner tells the judge to be deferential to that. So faced with that entire record, what you see below is a district court and, frankly, the MCC doing exactly what any court would wish them to do. Initially, when issues came up about the SAMs and there were concerns from Mr. Guzman about his ability to meet with his counsel, modifications were made. They put monitors on both sides of the divider screen in the meeting room. They gave Mr. Guzman a laptop in which he could view discovery alone. They expanded the size of the plot in the visitation room to pass discovery. And Judge Lynch, as you noted, it got to the point where Mr. Guzman was meeting with his counsel 20 hours a week, to the point that the MCC actually had to change their procedures for other defendants on his unit to meet with their counsel because Mr. Guzman was using the room so much. And that goes to your point, Judge Lynch. The question that we wanted answered, that you wanted answered in Mr. Guzman's brief, doesn't appear there, and it didn't appear here today at oral argument, which is the question of prejudice. What harm did you suffer? I think Mr. Furnish actually said at one point, we can't point to prejudice. But part of his reason for that was because there were these other security concerns, because there were these ex parte filings presented to the court. But it's very important to remember, as we say in our brief, apart from SEPA, which is its own issue of classified litigation, apart from SEPA, they have all of the ex partes now. And before this court, Mr. Guzman is not pointing to a single one that he says, oh, if only we had known, if only we'd been able to litigate this, things would have come out differently on the due process analysis. And so to the extent that that's where this inquiry goes, whether you call it prejudice or whether you call it the second prong of Turner about an alternative means for a prisoner to exercise the right, we simply don't see that in the record here. And on that record, there's no basis to conclude that the district court erred in upholding the SAMs and solitary confinement. Could any of the allegedly unduly restrictive conditions be challenged on appeal prior to a conviction? I'm not sure that we can take a position on that, Your Honor. Because that wasn't presented, I haven't given that much thought. And I'm not sure that our office has given it a lot of thought. Certainly, the procedural mechanisms to mount a challenge are there. Whether that begins with a separate action or whether it begins with administratively inside the Bureau of Prisons filing a grievance, which this record shows Guzman did about various other things, many of which were addressed, I'm not sure procedurally how that goes. But yes, certainly to the extent that there was still an issue after these modifications were made to the attorney visitation room, that didn't have to be the end of the story for Mr. Guzman. If his trial counsel still felt like they couldn't adequately meet with him, they could have raised that. Whether it was before the district court directly or in some ancillary proceeding, I'm not sure. But the record doesn't show that that was ever raised after those modifications were made. And with respect to the conditions, what's the justification for a 24-hour illumination of the cell? Justification for the cell being illuminated? Yeah. I can't remember, Your Honor, if the record discloses BOP's view and MCC's view about that. So unfortunately, I would only be speculating. But it was a security measure to, I assume, help ensure that everything was safe and that the defendant was still there and still alive, still healthy. Does that require bright lighting? Or could it have been accomplished by enough illumination to see that he is there and safe? That I'm not sure, Your Honor. I'm not sure what's required. I do know that Turner counseled the district court to be deferential to what the prison officials, in their experience and their expertise, deemed necessary in order to effectuate the mission of the facility. Oh, well, I have no doubt that they deemed it necessary. But of course, they're not the final arbiters of constitutional conditions. Of course. And the authorities, the literature that is concerned with the consequences of long-term incarceration, do seem to think that bright lights for 24 hours a day, even in short-duration cases, is something that should be avoided. There may very well be some literature on that, Your Honor. But candidly, I don't remember this particular issue being litigated to any great extent before the district court. I'm not sure that the scale of illumination is squarely in the record here. Well, when you say to any great extent, are you able to tell me it wasn't raised below? Standing here today, Your Honor, I cannot recall whether the issue of illumination was raised. We can certainly submit a letter on that, pointing to the appropriate place in the record, if necessary. Right. Thank you. Thank you, counsel. Mr. Furnish, you have three minutes for rebuttal. Let me just clear the underbrush first on the condition. With respect to the lights, it's in the record in one of the decisions. And you really, again, I'm not going to dwell on this. You really can't make this up. It's spun out with electricity and overturning furniture. And there's going to be an attempt to escape. And if we don't keep all the lights on, they'll overturn the furniture. And there'll be an elaborate escape plan. It's in one of the opinions or one of the memos that was submitted below. I can't answer it right now. And I think it's in your brief somewhere. It's somewhere. As one of the things that is specifically a condition that you're challenging on appeal. We've been here a very long time this morning. I'd like to move this quickly. We'll find it one way or the other. Yeah. As to what Your Honor was referring to before about the cop-outs, there were administrative grievances filed. I don't want to put the business about Younger in the opening argument. I don't want to suggest that they sat on their hands. They did what they did with the BLT. But unless the court really wants to, I don't want to get back into the Younger thing. I do want to answer Your Honor's question. And you had my friend speak to the fire for a bit about the per se rule. I'm going to point the court to the Vitale case. It's 418 F3rd something or other. And the case from this court says that in cases of juror misconduct, each case is sui generis. So this isn't something that's amenable to a per se rule. What's competent? You can't have a black and white rule because these situations are so diverse. Wait. When you say they're sui generis, aren't those cases that are assessing the juror misconduct itself, not the report of the misconduct? It's not easy to neatly separate the need for hearing and the ultimate extent of the misconduct. If not, I would have thought that's the easiest thing in the world. The misconduct is misconduct. What did the juror do? Did he take a bribe, or what did he do? The other question is, who reports it? I don't know what's hard about separating those two questions. So the standard is when there's reasonable cause to investigate, the court should investigate, or an investigation is mandatory. No, no, no, but you started with the cases are sui generis. And what I'm asking you, are those cases that are talking about the juror misconduct or the report of the misconduct? Yes. The reason is they tend to conflate the two. And when there's doubt, I understand you're dealing with El Chapo. I'm not in another world. When there's doubt in an ordinary case, a hearing is usually held. You wrote about which issue, and you say that they tend to conflate it. The courts tend to conflate the two issues. And the reason is, it's very, very rare that the allegations are substantiated to the point where a conviction is reversed. Usually, there's a hearing, and it doesn't go anywhere. Of course, it's the outlier case where it's reversed. So usually, they're talking about the denial of a hearing. And that's almost always the issue on appeal. So it's not easy to separate the two issues. That's my point. I want to talk a minute, because the government is rightfully, I guess, harping quite a bit on the fact that the reporting party was anonymous. He's anonymous because the government asked the panel to remain anonymous. The district court permitted them to remain anonymous, and the district court said it. No, that's an entirely different kind of anonymity. If the person came forward, and if the article said, he's juror number six, then he would not be anonymous for purposes of this argument. It's not a question of no one knows the name of the person who spoke to the reporter, if anyone. It's that that person came forward without specification as to which juror or alternate he, she, it, they, them were. Quote, for obvious reasons. That's what the juror said in the article. I'm maintaining my anonymity for obvious reasons, and because the judge said at the end of the trial, you never have to give up your anonymity. However, the reporter writes in there, I attended the trial every day. I recognized this person. This person was on the jury. So there's not really any dispute about that. But you can't have the anonymity that's both the sword and the shield. He, she, they, it was permitted to come forward in the manner that they did, and report something troubling, and maintain their anonymity at the same time. And the reporter said, you're brave to do this. And the juror said, I'm either brave or stupid. We'll find out. So you can't tax the person for name. No one's taxing a person. The question is what the government is trying to do, rightly or wrongly, is to distinguish a case in which a juror signs an affidavit saying this happened from a case in which a reporter says a juror told me this. And I'm not going to tell you which juror it was. And that juror was not anonymous to the reporter. Maybe the reporter did not know his or her name. But the reporter purports to know who it was. But the court doesn't know who it was. So that may not matter. I understand that. But that's got nothing to do with the fact that the jury, at the stage of voir dire, was anonymous and the various problems that that does or doesn't cause for the defense's ability to investigate jurors on voir dire. That's a different story. To be clear, I understand. To be clear, I've never challenged the empowerment of an anonymous juror. What I'm saying, and again, I don't want to get into the weeds. We have a limited timeline. To discredit or attempt to discredit the caliber or quality of the allegation by virtue of the anonymity is not appropriate in this particular case, where the judge especially said at the end, I encourage you to maintain your anonymity. That's all. Now, let's talk about the actual report for a moment. Because my friend said, well, we can't credit this report because it's simply contradicted by the record. What the record said, and I think, Judge Lynch, you hit on it. One juror came forward and they said, I saw a headline about vitamins, but I didn't read it. And another said, I opened up Reddit. It had Chappell's name. I didn't close it. I closed it, but I didn't read it. That's in no way inconsistent with the article. Let's read the article in context. And I'll just read the money shot, very briefly. And this is Hamilton, the reporter, talking. I mentioned on Twitter that the judge was likely going to meet with the jurors in private and ask whether they had seen the story. And the government is putting an awful lot of emphasis on the word seen. What the record says is that two people came forward and said they saw headlines, one about a vitamin and one about something in Reddit. The juror said they, and the word they means there, the juror. They, the juror, read my tweet before arriving at the courthouse and reported what was coming to other jurors. Quote, I had told them, if you saw what happened in the news, and again, they're putting so much emphasis on the word saw, just make sure that the judge is coming in and he's going to ask us, so keep a straight face. So he did, indeed, come to our room and ask us if we knew, knew, which is different than saw. They saw a headline, and we all denied it, obviously.  The juror who spoke with Vice News said that, quote, for sure, end quote, five jurors who were involved in the deliberations, plus two of the alternates, had at least heard about the child rape allegations against Al Chappell. I mean, there's nothing in the record that contradicts this. Two people in the record said they saw it. One said they saw a headline and moved on right away. And one said, I opened up Reddit, I saw the name Al Chappell, and I closed it. How does that contradict this? It doesn't. It's entirely consistent. I want to go back to, and my friend talks about the McDonough standard, and this ties right in. The McDonough standard applies to lies told during voir dire. You can make mistakes during voir dire for any number of reasons, which is why I didn't hit so hard the voir dire claim, because somebody, in theory, could honestly claim, I think I could follow the directions at that time, at the time they gave the answer. And maybe later, it turns out not to be true. So maybe they didn't intentionally lie. Maybe they cover up their background in voir dire because they're embarrassed about it. They're mistaken. They don't want to be humiliated. There was a case, one of the cases I read over the weekend, somebody who misrepresented their criminal history from 17 or, you know, back when they were 17 or 18. They said there should have been a, I think they said there should have been a hearing anyway. That's not it. In the middle of trial, according to this, if we take it as true, they just told a bald-faced lie. They said they were concerned about contempt, getting arrested. The judge said, you're not going to get in any trouble. I just want to know the truth. You didn't do anything wrong. No, what this is about, one can infer in the absence of a hearing, and one should infer that this is exactly what happened in Paris. They wanted to sit, and they didn't want to get excused. Or at least this person, they didn't want to be dismissed. They wanted to sit on the case of the century. It's better to be on the case, in the case of the century, in history, than watching it on TV. That's what Paris says, and that's what Columbo says. It's exactly what we don't want on the jury. Jury proof. That's what we don't want. That's the big problem. That's what Baker says, and that's what McCoy, the most recent case in this court, says just three months ago. That's a fair influence here. If the judge says, you're not in trouble. You didn't do anything wrong. Just tell me what happened. Why would they be afraid of arrest and contempt when he just said that? It doesn't make any sense. And you can't leave that unexamined. You can't leave that unexamined. Talk about prejudice. I've said it. I think it's a structural error argument. This is not such a slam dunk. They talk about six days. Six days shows a horrible chance of prejudice. It wasn't so overwhelming as they thought. Otherwise, they wouldn't have been out for six days. Sexual raping, young girls, they think that's something that's just ho-hum, prosaic. What about Epstein? What about Ranieri? These people are the most reviled members of society. They're savaged in the press. If you go into a prison, a pedophile is the lowest of the low, no matter how many murderers there are. Now, if you take their prejudice position, and the district court's prejudice position, to its logical conclusion, if you take that argument to its logical conclusion, no violent criminal would ever be able to get a reversal, let alone a hearing on extrinsic evidence, because they're prejudice proof. Not just happen. Anybody. Anybody who kills, anyone who engages in rampant violence cannot get a hearing, even if the article says, you're responsible for 9-11, you're a baby killer, you killed JFK, because they're so bad, and the case is so bad, and they're so violent, and they're so awful. That effect cannot be. It cannot be. Otherwise, all this law about during this conduct, we might as well just rip Remmer up, and just throw it in the garbage. So that's it. That's the end of my pitch, unless the court has any further questions. Thank you, counsel. We'll take the case under advisement. The remaining two cases on the calendar for today are on submission, so that concludes our arguments for today. I'll ask the courtroom deputy to adjourn. Court stands adjourned. Thank you.